AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| WESLEY KENNETH MCVAY | )  Case No. |
| | )      6:18-mj-1144 |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____11/30/17 through 2/16/18____ in the county of _____Orange_____ in the

____Middle____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § § 2252A(a)(2) and (a)(5) | Receipt of child pornography and possession of child pornography |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Joe Grey, Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: __3/2/2018__

_____
Judge's signature

City and state: _____Orlando, Florida_____          KARLA R. SPAULDING, U.S. Magistrate Judge
_____
Printed name and title

STATE OF FLORIDA                          CASE NO. 6:18-mj- 1144

COUNTY OF ORANGE

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph R. Grey, after being duly sworn, depose and state:

1.     I am a Special Agent (SA) with the United States Immigration

and Customs Enforcement (ICE), Homeland Security Investigations (HSI)

formerly called the United States Customs Service, and have been so employed

since October 2007.  I am currently assigned to the Office of the Assistant

Special Agent in Charge, Orlando, Florida, which is responsible for

conducting criminal investigations and enforcing laws that are under the

investigative jurisdiction of the ICE-HSI in the counties of Orange, Lake,

Marion, Osceola and Seminole in the Middle District of Florida.  I am a law

enforcement officer of the United States within the meaning of 19 U.S.C.

§ 1401(i), and am empowered to investigate and make arrests for violations of

United States criminal laws within the meaning of 18 U.S.C. § 2510(7).

2.     Prior to becoming a Special Agent with ICE-HSI, I was

employed as a Trial Attorney for the ICE Office of the Principal Legal

Advisor.  I am a graduate of the Federal Law Enforcement Training Center

and hold both a Bachelor degree in Criminology and a Juris Doctorate from

the University of Florida.

3.     As a Special Agent, my responsibilities include investigating possible criminal violations of U.S. Customs and related laws.  I have received specialized training in the investigations of sex crimes, child exploitation, child pornography, and computer crimes.  I have been involved in investigations of child pornography and online solicitation/enticement of a minor.  I have participated in investigations of persons suspected of violating federal child pornography laws, including 18 U.S.C. §§ 2251, 2252 and 2252A.  I have also participated in training courses for the investigation and enforcement of federal child pornography laws in which computers are used as the means for receiving, transmitting, and storing child pornography.  Additionally, I have been involved in authoring and participated in the execution of search warrants involving searches and seizures of computers, computer equipment, software, and electronically stored information.  I am a member of the Homeland Security Investigations (HSI) and Florida Department of Law Enforcement (FDLE) Child Exploitation Cyber Crimes Task Force.

4.     This affidavit is submitted in support of a criminal complaint against Wesley Kenneth MCVAY.  As set forth in more detail below, I believe there is probable cause that MCVAY is involved in receiving, possessing, and distributing sexually explicit images of minors and child pornography in

interstate commerce, in violation of 18 U.S.C. §§ 2252A(a)(2) and

2252A(a)(5).

5.     I make this affidavit from personal knowledge based on my

participation in this investigation, information from other criminal

investigators, information from law enforcement officers, information from

agency reports, and the review of documents provided to me by these

witnesses and law enforcement officers.  Because this affidavit is being

submitted for the limited purpose of establishing probable cause for the

issuance of a criminal complaint, I have not set forth each and every fact

learned during the course of this investigation.

## STATUTORY AUTHORITY

6.     Title 18, United States Code, Section 2252A, prohibits a person

from knowingly transporting, shipping, receiving, distributing, reproducing for

distribution, or possessing any child pornography, as defined in Title 18,

United States Code, Section 2256(8), using any means or facility of interstate

commerce, or in or affecting interstate commerce.

## DEFINITIONS

7.     The following definitions apply to this Affidavit and to

Attachment B:

3

a.     "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.     "Child Pornography," as used herein, includes the definition in Title 18, United States Code, Section 2256(8), which defines child pornography as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. See 18 U.S.C. §§ 2252 and 2256(2).

c.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

d.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether

between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

e.      "Computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, flash memory cards, thumb drives and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

5

g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.    "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected

data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      j.    The terms "records," "documents," and "materials," used herein include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to writings, drawings, and paintings), photographic form (including, but not limited to microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies), mechanical form (including, but not limited to, phonograph records, printing, and typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as digital cameras, floppy diskettes, hard disks, CD-ROMs and digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, laptop computers or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

      8.    Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornography formerly was produced using cameras and film

(either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

9.     Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in

home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

11. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained

unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains wireless software and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## BACKGROUND ON PEER TO PEER (P2P) FILE SHARING

14.     A growing phenomenon on the Internet is peer to peer file sharing (hereinafter "P2P"). P2P file sharing is a method of communication available to Internet users through the use of special software. The software is designed to allow users to trade digital files through a worldwide network that is formed by linking computers together. While there are several P2P networks currently operating, the most predominant is the Gnutella 1 network. There are several different software applications that can be used to access these networks but these applications operate in essentially the same manner.

15.     To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet. This software is used exclusively for the purpose of sharing digital files. When the P2P software is installed on

a computer, the user is directed to specify a "shared" folder.  All files placed in

that users "shared" folder are available to anyone on the world-wide network

for download.  Most P2P software gives each user a rating based on the

number of files he/she is contributing to the network. This rating affects the

user's ability to download files.  The more files a user is sharing, the greater

his/her ability is to download files.  This rating system is intended to

encourage users to "share" their files, thus propagating the P2P network.

However, a user is not required to share files to utilize the P2P network.

    16.    A user obtains files by conducting keyword searches of the P2P

network. When a user initially logs onto the P2P network, a list of the files

that the user is sharing is transmitted to the network.  The P2P software then

matches files in these file lists to keyword search requests from other users.  A

user looking to download files simply conducts a keyword search.  The results

of the keyword search are displayed and the user then selects file(s) which

he/she wants to download.  The download of a file is achieved through a

direct connection between the computer requesting the file and the

computer(s) hosting the file.  Once a file has been downloaded, it is stored in

the area previously designated by the user and will remain there until moved

or deleted.  Most of the P2P software applications keep logs of each download

event.  Often times a forensic examiner, using these logs, can determine the IP

address from which a particular file was obtained.

17.     A person interested in sharing child pornography with others in

the P2P network need only place those files in his/her "shared" folder(s).

Those child pornography files are then available to all users of the P2P

network for download regardless of their physical location.  Files located in a

peer's shared directory are processed by the client software.  As part of this

processing, a SHA1 hash value is computed for each file in the user's shared

directory.  SHA1 or Secure Hash Algorithm Version 1 is a mathematical

function which may be used to produce a unique digital signature of a file.  It

is computationally infeasible $(2^{160th})$ to find two different files that produce

the same SHA-1 value.  The Secure Hash Algorithm (SHA) was developed by

the National Institute of Standards and Technology (NIST), along with the

National Security Agency (NSA), for use with the Digital Signature Standard

(DSS) as specified within the Secure Hash Standard (SHS).  The United States

of America has adopted the SHA-1 hash algorithm described herein as a

Federal Information Processing Standard.

18.     A file processed by this SHA1 operation results in the creation of

an associated hash value often referred to as a digital signature.  SHA1

signatures provide a certainty exceeding 99.99 percent that two or more files

with the same SHA1 signature are identical copies of the same file regardless of their file names.

19.     As stated above, there are several different P2P networks most commonly used to share and download files via the internet. The most common P2P network is the Gnutella network. The Gnutella network uses SHA1 values to uniquely identify and process images or videos offered on their network. The Gnutella network uses SHA1 values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple peers and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses SHA1 values to ensure exact copies of the same file are used during this process.

20.     A person interested in sharing child pornography with others in one of these P2P networks, need only place those files in his/her "shared" folder(s). Those child pornography files are then available to all users of the P2P network for download regardless of their physical location. Users may receive a selected file from numerous sources by accepting segments of the file from multiple peers and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different

13

sources only if all the segments came from exact copies of the same file. The Gnutella P2P network uses assigned SHA1 values to ensure exact copies of the same file are used during this process.

21.    A person interested in obtaining child pornography can open the P2P application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The keyword search would return results of files being shared on the P2P network that match the term "preteen sex." The user can then select files from the search results and those files can be downloaded directly from the computer(s) sharing those files.

22.    The computers that are linked together to form the P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A person that includes child pornography files in his/her "shared" folder is hosting child pornography and therefore is possessing and potentially distributing child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A.

23.    One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a user downloading an image file may actually receive parts of the image from

14

multiple computers. The advantage of this is that it reduces the time it takes to download the file. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, most often expressed as four numbers separated by decimal points, is unique to a particular Internet connection during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

24.     Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is designed only to allow files to be downloaded that have been selected. One does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge. Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without his/her active participation.

## DETAILS OF INVESTIGATION

25.     On December 08, 2017, FDLE Cyber Crimes Task Force Agent (TFA) Melissa Holt was conducting an online child exploitation investigation and saw that IP address 184.89.44.172 had offered hundreds of files containing suspected child pornography for distribution or sharing from November 30, 2017 through December 07, 2017. The following is only one

example from the hundreds of files IP address 184.89.44.172 offered for

distribution or sharing:

> HASH:
> 7RKJKHCVM3H2WEIOMI3VKM4O66IOBMIL
> Date/Time: 12/7/2017 10:15
> File Name:  ! New ! (Pthc) 2007 Tara 8Yr - Tara
> Kinderkutje) (Pedo)
> (Ptsc)_to_DivX_clip0.avi
>
> This video file is described as being approximately
> three minutes in length and depicts a naked
> prepubescent girl on all fours on a bed. A semi-nude
> adult male is standing next to the bed and is holding
> the back of the child's head as he thrusts his erect
> penis into the child's mouth. The video cuts to the
> man lying on his back with his legs spread to the
> camera. The same child is seen performing oral sex
> on his erect penis. The video cuts to the same man
> and same child in reversed positions. The child is on
> her back with her legs spread to the camera as the
> man performs oral sex on the child's vagina. The
> video cuts to the same child in close up as she
> performs oral sex on a man's erect penis. The child
> is seated on a bed and the naked man is standing
> next to the bed. He has his hand on the child's head
> and she is performing oral sex on the man's erect
> penis. The video cuts to the same man and child.
> This is a close up of the child's face as the man
> ejaculates into the child's face. The child has no
> pubic hair, no breasts, and is smaller than the man.

26.     On or around December 12, 2017, the Office of Statewide

Prosecution issued a subpoena to the Internet Service Provider (ISP),

Spectrum, who leased IP address 184.89.44.172.  On February 16, 2018, law

enforcement reviewed the response from Charter Communications, which

contained the following account details:

> Billing Name: [redacted] Mcvay
> Service Address: xxxx Larkin Ave Orlando, FL 32812
> Telephone #: 407-xxx-2380

27.     TFA Holt verified the existence of a residence at xxxx Larkin

Avenue Orlando, Florida and when she went to that address, she was unable

to detect the presence of any unsecured wireless networks there.  TFA Holt

checked the Driver and Vehicle Information Database (D.A.V.I.D.) which

showed that the name on the ISP account and a "Wesley Kenneth Mcvay," a

registered sexual offender, each had Florida drivers' licenses, with a reported

home address of xxxx Larkin Avenue Orlando, Florida.  Further law

enforcement database queries revealed that, in addition to being a registered

sex offender (for state felony convictions), MCVAY is also a convicted felon.

Furthermore, on October 16, 2009, Senior District Court Judge Gregory A.

Presnell sentenced MCVAY in the Middle District of Florida to thirteen

months in federal prison for a violation of 18 U.S.C. § 922(g)(1), possession of

a firearm by a convicted felon.  TFA Holt also noticed during her databases

searches that MCVAY has full custody of his twelve-year-old son.

28.     After February 16, 2018, Cyber Crimes TFAs conducted

surveillance at xxxx Larkin Avenue and saw a motorcycle under the carport

area in the driveway of the residence. A query of the D.A.V.I.D. database

revealed that MCVAY had a 2005 gold Harley Davidson motorcycle, tag

WL6D registered to him.

29.     TFA Holt sought and obtained a state search warrant for child

pornography at the MCVAY residence.  On February 28, 2018, your affiant,

along with other members of the HSI/FDLE Cyber Crimes Task Force

executed a search warrant at xxxx Larkin Avenue Orlando, Orange County

Florida 32812.  MCVAY was encountered in the car port area of the residence

and detained for questioning.  TFA Holt and TFA William Nuzzi advised

MCVAY of his *Miranda* rights at which point MCVAY invoked his right to

remain silent, so no further questions were asked and he was escorted to a seat

near the carport of his residence.

30.     During the execution of the search warrant, agents discovered a

backpack in the residence.  Inside the backpack was a laptop computer and

various documents identifying MCVAY as the owner of the backpack and its

contents.  They began to conduct a forensic preview of the laptop and found

dozens of images and videos of child pornography on it.  (As of March 2,

2018, analysis by computer forensic agents has revealed the presence of

approximately forty-four images and thirty-eight videos of child pornography.

Many of these images and videos depict children less than twelve years of

age).

31.     While agents conducted the forensic preview of the laptop, TFA Nuzzi was standing with MCVAY for security purposes. MCVAY repeatedly made the spontaneous utterance, "I shouldn't have let my cousin back in my life." At one point, agents told TFA Nuzzi that they found files depicting child pornography on MCVAY's laptop, so at that point TFA Nuzzi placed MCVAY under arrest. TFA Nuzzi asked MCVAY if there was anyone he could call to come to the residence to be with MCVAY's twelve-year-old-son (who was also at the residence during the search warrant execution).  MCVAY asked TFA Nuzzi to call his wife (the child's step-mother) and have her come home from work. TFA Nuzzi called MCVAY's wife and let MCVAY know that she was on her way home, to which MCVAY again stated, "I should have left my cousin alone." At that point, MCVAY spontaneously told TFA Nuzzi that he wanted to make a statement. MCVAY said he wanted to make it now so that it would not later appear as a lie he told an attorney. TFA Nuzzi reminded MCVAY he had already invoked his right to remain silent but MCVAY said he had changed his mind and wanted to make a statement.

32.     After MCVAY's re-initiation of communication, TFA Nuzzi got his digital recorder and again advised MCVAY of his *Miranda* rights after he began recording the interview.  MCVAY waived his rights and agreed to speak with TFA Nuzzi and HSI Special Agent Ryan Eggland. TFA Nuzzi confirmed

19

for the record that MCVAY requested to make this statement and was not offered anything, promised anything, or threatened to make him make this statement. MCVAY agreed and said his statement was being given of his own free will.

33.    MCVAY told agents the following:  MCVAY claimed his cousin was arrested in 2013 for possession of child pornography and was currently serving time in a Federal Penitentiary in Texas. MCVAY said he was there at the time of his cousin's arrest and that his cousin had recently been in contact with him, and said he was innocent.  According to MCVAY, his cousin told him someone had used his computer to download child pornography and then deleted it with "forensic software." MCVAY said he did not believe his cousin and wanted to prove he was lying, so he downloaded large quantities of child pornography and deleted them with "forensic software" he had also downloaded from the internet.

34.    TFA Nuzzi pointed out that MCVAY's explanation for downloading child pornography raised some questions and asked if he could clarify. MCVAY agreed.  During the continued conversation, MCVAY admitted he had used the Peer to Peer (P2P) software Shareaza to download the files. When asked, MCVAY told TFA Nuzzi he knew a person could search P2P software for files and the software would seek out hash values

containing these types of files. MCVAY advised he used search terms to locate and download child pornography. He admitted to using the search terms, "PTHC" (which I know from my experience with these types of cases stands for PreTeen HardCore), "Lolita" and "Pedo." MCVAY admitted he would view the files after downloading them but he explained he did this only to confirm the files did in fact contain child pornography. MCVAY advised he would then delete the files using the "forensic software" he had downloaded. TFA Nuzzi asked MCVAY why he just did not just download normal video files or at least files depicting adult pornography to test whether deletion of videos or images was possible. McVay said, "I never thought of that." MCVAY further said the arrest of his cousin made him look bad because he was there with him at the time of the arrest, and he knew he was a convicted sex offender. MCVAY said that his cousin kept insisting that a friend downloaded the child pornography without his knowledge, so MCVAY persisted in his claim that downloading child pornography was his way of conducting research to prove his cousin wrong.

35.    After the execution of the warrant, on March 2, 2018, computer forensic agents discovered evidence in the form of a partial video file on MCVAY's laptop showing receipt of child pornography. The video file was only partial because it was in the process of being downloaded and received

21

on February 28, 2018 at approximately 00:05 hours (EST) (hours before the execution of the search warrant on MCVAY's house). The partial file was located in the incoming peer-to-peer Shareaza application's incomplete directory path. While only a partial video, it was still viewable and depicted a pre-pubescent Asian girl, less than 10 years of age. The child is naked on a bed and an apparent adult male manipulates the child's vagina with his fingers and has penile-vaginal intercourse with the child.

36.     During the execution of the search warrant, agents also encountered the twelve-year-old son of MCVAY (hereinafter referred to as "KM"). TFA Holt observed a scratch on the cheek of KM as well as a bruise and broken blood vessels on the child's left ear. Due to the history of the family and prior abuse allegations that TFA Holt was aware of, TFA Holt immediately contacted the Florida Department of Children and Families (DCF) to report the possible physical abuse to the child. DCF Investigator Veronica Scott responded to the residence shortly thereafter. Later, Investigator Scott contacted TFA Holt and said they were transporting KM to the Orange County Child Protection Team for a forensic interview and medical examination.

37.     On February 28, 2018, DCF Investigator Veronica Scott transported KM to the Orange County Child Protection Team for a forensic

and medical examination. Case Coordinator Katie Masters conducted the forensic interview with KM. During the interview, KM denied being physically abused by MCVAY. KM claimed the injuries to his face were caused from playing with his friend "Ryan." KM could not provide any further information about Ryan. During KM's medical examination, the examiners found numerous bruises and welts on his arms, legs, buttocks, scalp and lower back. KM said that over the weekend MCVAY "beat him with a belt because he lied to him." After the forensic interview was completed, the Child Protection Team determined that there was verified abuse in KM's case and notified the Orlando Police Department (OPD). OPD assigned the case to a Detective to pursue child abuse charges. On March 1, 2018, DCF filed an Affidavit and Petition for Placement in Emergency Shelter in support of their claim that probable cause existed to remove KM from the legal care of his legal guardian, MCVAY, based on KM being the victim of abuse. In their affidavit, DCF noted that KM's mother could not be located and they recommended that KM be placed with MCVAY's mother because MCVAY was currently in custody on state charges. On March 2, 2018, I confirmed with DCF that they placed KM into his paternal grandmother's custody, at least until the arraignment on their petition on March 27, 2018.

23

38.    Based on the above information, I believe probable cause exists establishing that MCVAY has committed violations of 18 U.S.C. § 2252A(a)(2), which makes it a federal crime for any person to knowingly receive or distribute child pornography that had been shipped and transported using any means and facility of interstate and foreign commerce or that had been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer; and 18 U.S.C. § 2252A(a)(5), which makes it a federal crime for any person to knowingly possess materials that contain images of child pornography that had been shipped and transported using any means and facility of interstate and foreign commerce or that had been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

39.    This concludes my Affidavit.


Joseph R. Grey
Special Agent
Homeland Security Investigations


Sworn to and subscribed before me
this 2C day of March, 2018


Honorable Karla R. Spaulding
United States Magistrate Judge